We will call 5-15-0438, Cashner v. Anderson & Gilbert, L.C. Counsel for the appellant, your name, please state your name for the record. Thank you, Your Honor. Good morning. My name is Maureen L. Labaza, and I represent Anderson & Gilbert in this appeal. This morning's appeal really centers on what is purported to be an order of attachment that the Bonn County Circuit Court entered on March 26, 2013, and a subsequent effort on the Court's part to modify and clarify through non-protonic authority that are, before I get to the Illinois law that applies to this, I think a few facts that are agreeable by both parties would be beneficial to the Court to understand what is going on. In the previous appeal, you heard Mr. Antinoli, who represents Mr. Dugan and Mr. Draper in this matter, state that in count one of the speed loop matter had been dismissed. Well, he's correct, it was dismissed. It was dismissed so that it could go to arbitration. Mr. Dugan, on behalf of Anderson & Gilbert, representing Charles Cashner, who we still represent, took that matter to arbitration, was successful, and got an arbitration award in late 2012. Then, pursuant to Illinois law and rules, Mr. Dugan, on behalf of Anderson & Gilbert and Mr. Cashner, made a motion to the Bonn County Circuit Court in early January of 2013 to have that arbitration award confirmed. Well, around that same time, Mr. Draper and Mr. Dugan, who you've heard are members of Speed Loop LLC and also members of another LLC you haven't heard of, Athlete LLC, who had a separate cause of action, not a consolidated matter referred to in the last appeal, sought, went through a motion before the Bonn County Circuit Court in order of attachment, and at the time in January when they filed that, they filed what I'll refer to as an IOU bond. What do I mean, an IOU bond? It sounds kind of flippant. Well, that's what it is. I promise to pay you $150,000 if I'm wrong. Was there security to it? No. Well, on February 19th, the Bonn County Circuit Court not only took up the motion for an order of attachment, but it took up two other motions that have no relationship to the appeal today. And it took all three motions under advisement, and then on March the 26th, as I said before, the court entered an order, and it's nominated simply as an order. The first two paragraphs of that order dismissed, denied the previous unrelated motions. It was the third paragraph that addressed the motion for the order of attachment. Now, we're going to agree with this one finding of the court. The court found in that March 26th order that Mr. Draper and Mr. Dugan, well, they had put on evidence to convince the court that they had a right to an order of attachment if they met the rest of the requirements of the statute. Now, the court in Bonn County looked at the IOUR bond and said, this bond is not sufficient. And in fact, before an order of attachment commission, here's what you must do. Mr. Draper, Mr. Dugan, please come back. You have two alternatives for security. One, bring to you with us, to you, with you to me, a property bond in the value of $300,000. That's a little bit more than double the $140,000 judgment there, right? Or alternatively, you bring to us unencumbered property that I can appraise to be valued at $300,000. And then the court finished that order by saying, when you come back to this court with what I've asked you to bring for surety, for security to your bond, then an order of attachment may then issue without further hearing. May I ask you this, counsel? Sure. Does Judge Knight have the authority to enter an order of attachment that would be valid without requiring security? No, Your Honor, he does not. No court does, Your Honor. And that isn't for Favazza. That's Illinois statute. And I will address that in a moment by citing the statute. But the remainder of the facts that I think are necessary for you to appreciate what the appeal is about, Favazza, is this. On March 28th, Anderson and Gilbert filed this notice of attorneyship with all the appropriated defendants and with the court in Bond County. Then absolutely nothing happened in the Bond County circuit court until July 8th. And at that time, Mr. Draper and Mr. Duden asked the court for leave to change what the security they would need in order to have an order of attachment. And they prayed that the court allow them to bring in an irrevocable letter of credit in the amount of $300,000. And Judge Knight, he's had a busy day today, Judge Knight said you have until the 9th of September 2013 or I'm going to set aside my vote, my order, saying you have a right to an order of attachment. What happened next on July 17th, I filed on behalf of Anderson and Gilbert a petition to enforce our attorney's land, statutory land, in Bond County against Speed Blue. That was noticed for a hearing and a hearing was held on it on August 20th, 2013. Now, I'll pause for a moment. You may ask, were in the stream of facts did Draper and Duden show up with any security for their IOU bond? They didn't. At the time of the hearing for our statutory leave filed land, there was no security behind their IOU bond. Yet, on September the 19th, the trial court entered an order which in its own inevitable way dismissed our petition without any relief. In fact, it said it didn't have to rule on our petition at all, which I count as a dismissal. In that order, and I'll refer to it, it's in the record that we filed with the court, it's in A51 at the very bottom, and I'll paraphrase if you don't mind. It says in earlier proceedings, Duden and Draper moved for an attachment against a judgment in favor of cashier against Speed. A bond was filed with the motion. The motion was allowed by this court to order March 26th. That same order noted that a bond was unfiled, but that the surety was insufficient to provide adequate security for the bond. Well, let's stop for just a moment. Now it's time to talk about what the Illinois case law says about that. And I'm going to refer, Your Honors, to the statute that's found in 735 ILCS Section 5 slash 4 dash 107. And I'll paraphrase it for the court. Bond. Before the entry of an order for attachment, the court shall take a bond and sufficient security payable to the people of the state of Illinois. Now, the legislative intent in that is pretty clear, isn't it? If a court is going to take somebody else's property and give it to someone else on a contingent claim, then you better take security to protect the person's property that you've just given to someone else. That makes sense. That's perfectly clear. In fact, later on in that statute, it says, I know Mr. Anthony is going to come up and say, but it doesn't say I need security. Well, you know, if the legislative intent was, we want to make certain that you protect the person's property that you took by making them put up security, then why would they allow an order of attachment to inners and be legal without them? They wouldn't. I'll refer back again to the record, A52. It's the continuation of the order of September 19th. And this is where the non-proton aspect of the appeal comes. The court says the order was not carefully drafted. It did not use appropriate terminology. Kind of hard to understand that. The intent of the court's order was to recognize the legal right to the attachment, and then parenthetically, which by statute, I guess he's referring to this one, He forgot the words, and sufficient security, and to establish its priority. Well, either the court didn't read and apply law as it's written, or perhaps Judge Knight was going to create a new law. It's called the right of attachment that gives you all of the rights of an order of attachment without having to be messed up with providing security. I don't think that's what the law allows. But even if that were true, let's look back to those facts, because they're stubborn, aren't they? He says, with the existence of a bond. Well, no one, not even Mr. Anamola, will tell you that the bond shouldn't be double of what the property was that he took. Well, what was that paper I read in January 4th? It was $150,000. So even if the court were to create out of magic some right of a priority to an order of attachment without security, the bond that he had in his hand wasn't double the value. He can't do that either by statute, by common law, or common sense. In the end, the court entered this order on the 19th, and he didn't allow us the ability to appeal it, because as a matter of rules, we didn't have that right. Let me ask you this, Counselor. That order, as to those fees, $140,962.51, wasn't there a turnover order entered as to that money? Well, Your Honor, you make a very good point. After we appealed this decision initially, and this court sent us home saying that we weren't ready to have an appeal heard because we weren't entitled to an appeal under the law, and the judge did not allow us, by the language of the order, to appeal it, the matter proceeded under the Jefferson County judgment under Mr. Draper, and then in December of 2014, the court had a hearing and said, well, Mr. Draper has a million-dollar judgment, so we're going to give him the cash rejectment, which is then worth a lot more than $140,000 when you add statutory interest, to you, Mr. Draper. Now, did anybody exchange cash, checks? Oh, no. No, that's not what they did. They did it through a sleight of hands called promissory notes. An LLC that Mr. Draper owned obligated itself to pay Mr. Draper the judgment. So when Mr. Angonoli says, oh, we can't touch this because it's all over with, the judgment's gone, well, that's not true either. And even if the judgment was paid to Mr. Draper, that doesn't cut off my client from our rights to the attorney's fees that we earned. Mr. Draper wouldn't have a penny if it wasn't for what we did. And, Your Honor, that order on December 9, 2014, it, too, wasn't subject to an appeal, either as a right that we had under the rules and laws, or under the way of the Court of Impeachment. And when, then, could we show up here when one Judge Knight said it's over? And here we are. This is the first time. This is now. You get a chance to rule on the merits. You know, the appellate brief that we filed has lots of case law supporting every point that we've talked about, but it has another aspect I have not yet mentioned, but I will if I have time. And that is the concept of inequitability. And what does that mean? Well, it means that when we sign a contingency fee agreement, and the attorney is going to look to a certain judgment fund to be paid, there's case law, cited in the degree, that says an inequity lien attaches at the time of signing the contract. Well, if that's true, then even if the March 26th article was, in fact, an order of attachment, and it cannot be under Illinois law, or if, in September 19, the Court, through its non-court-of-attempt order, somehow creates a new right of priority, that would have been on March the 26th, 2013, not the day of our contingency fee agreement. This Court has the power, the authority, and the obligation to make what was wrong, right. We asked the Court to remand it back to the Bonham County Circuit Court. That decision on September 19, 2013, which virtually dismissed our lawful petition for the enforcement of our statutory attorney's lien, and asked, with instructions, to have a judgment entered against Speed Loop, in the amount of our fee, 50% of the judgment, plus interest to date. And if the Court feels that it has to do something to justify Speed Loop's position with its own member, Mr. Draper, then they are a very capable attorney. I'll bet they'll figure out a way to, in order to reverse, so that Speed Loop doesn't pay twice. But that is not our problem. We couldn't get here, till now, to say our attorney's lien rights have been trampled. They've been trampled by an order of attachment, if that's what it was, that was illegal, because it didn't have security from day one. He talks about, in the 19th Ardor, September 19 Ardor, that he was simply trying to add additional security. Well, additional security would mean that you have security in the first place. Well, what security is there in a paper I.O.U.? You can't, he cannot, the Court cannot, create a different set of rules for Speed Loop, and for Mr. Draper and Mr. Doogan, than the rest of the state. You can't take the property of a nun without having sufficient security held by the Court to protect that person's rights, or someone who has a claim to it. That would be us. Your Honor, I have much more that I can discuss, but the appellate argument, I think, speaks for itself. And if you have questions, I'll be glad to answer them. And if not, I'll take my time and do rebuttal when Mr. Anthony presents. Thank you, Counsel. You'll have an opportunity to go live. I appreciate your time, gentlemen. Thank you. Counsel Baratole. Once again, good morning, Your Honors. David Antignoli, once again representing the individual defendants in this appeal. Draper, Doogan, and Harvison. There has been quite a lot of water running under the bridge between the time that the order in question was entered in September of 2013 and the current date. And, Justice Moore, you identified the most significant aspect of the water running under the bridge, and that was a turnover order entered by Judge Knight after the initial appeal by the appellants was dismissed for lack of jurisdiction. That turnover order renders the entire question of the so-called attorney's lien moot. As a result of that, we have filed a motion to dismiss the appeal on the grounds of mootness. A judgment was entered in favor of Mr. Cashner and against Spilu. After that judgment was entered, and while the original appeal was pending, Mr. Draper obtained a judgment against Cashner for a little over $2.5 million. It's the judgment that I referred to in the preceding argument this morning. Mr. Draper... Are you referring to the judgment in Missouri, in Jefferson County? Exactly, Your Honor. Mr. Draper took that judgment and registered it, pursuing the law, in Bond County. Following registration of the judgment, Mr. Draper commenced supplementary proceedings against Cashner and Spilu. And in those supplementary proceedings, Mr. Draper asked the court for a turnover order. A turnover order requiring any amounts that would otherwise be payable to Cashner under his judgment against Spilu to be paid over to Draper to be applied to the judgment that Draper had against Cashner. That turnover order was granted. The turnover order provided just exactly what Mr. Draper asked. It forced Spilu to pay the money that was otherwise payable to Cashner to Draper. And it compelled Draper, upon the receipt of those funds, to satisfy the judgment against Spilu. That was done. Now, it was not done in a vacuum. It was done over the objection of Cashner through his counsel. They not only objected to the entry of the turnover order, they filed a motion to reconsider. Judge Knight denied the motion to reconsider. At that point, the turnover order was final and subject to appeal. No appeal was taken. That's why the current case is moved. Because once that turnover order was implemented and the judgment against Spilu was satisfied, there was no longer any asset for Mr. Favaz's attorney's lien to attach. And now, for this Court, to say that that attorney's lien attached would be to undo or reverse or nullify the turnover order, an order that is final, binding, and unassailable on a collateral attack such as this. I want to invite the Court's attention to a case that I think is dispositive of the mootness issue. It's the Illinois Supreme Court's decision in In Re Tequila. It's cited at page 12 of our motion to dismiss. Tequila presents a procedural history that closely parallels what we have here. Tequila invoked an appeal by the natural mother of a young child from an order terminating her parental rights. The case proceeded through the appellate court and on to the Illinois Supreme Court. During the pendency of those appeals, in a collateral case, the child was adopted. The adoption order was never appealed. It was a final judgment, and it became final and incontestable before the natural mother's appeal reached the Illinois Supreme Court. The Illinois Supreme Court said, this case is moot. We are not in a position to grant the natural mother any relief because to do so, we would have to undo, unwind, nullify this adoption order, an order that's now final and binding on us. And we can't do that. Since we can't do that, the case is moot. That's the exact same situation we have here, Your Honors. The asset to which petitioners hope to attach a lien no longer exists. Now, Mr. Fevaza claimed, well, there's some shenanigans going on here. There was slight of hand between Draper on one end and Speedlube on the other. I'm not going to get into that issue, not because I agree with it, but because if there were such an issue, Mr. Fevaza had to raise it in connection with the terminal court. And he did, in fact, raise it. Judge Knight rejected it. And if they want to argue about that, or if they wanted to argue about it, they had to appeal the turnover order. They didn't. The debt is extinguished. The judgment has been satisfied. This Court can't grant the relief that Mr. Fevaza is after because to do it would be to nullify a binding final judgment in the form of the turnover order. Now, I will briefly turn to the merits of this case, the merits of the appeal, in case the Court doesn't believe that it's moved. And Mr. Fevaza is right about one thing. The priorities between the alleged statutory lien and my client's position involves application of the attachment statute. But what he's wrong about are a number of the facts that led to the issuance of the attachment order. First of all, he says that the so-called IOU bond was not a bond. It was not double the amount of the judgment. But I would ask the Court to look at the record. Actually, look at the supplemental record that we have filed with our motion to dismiss. And we see an attachment bond filed prior to the attachment order. This is at page 14 of the appendix. And it's in the amount of $300,000, not, as Mr. Fevaza suggests, only $140,000. It was double the value of the judgment. Second, Mr. Fevaza says that bond was unsecured. It wasn't unsecured. There were two signatories to that bond, Dugan and Draper. Each one stood a surety for the other. Now, it's true that the Court said additional surety should be filed. But that didn't render the attachment order invalid in any way. And, in fact, it's interesting. Mr. Fevaza says that it was not an order of attachment that the judge entered. Well, then I would ask, why did Mr. Fevaza's firm file a motion to set aside the order of attachment claiming that it was preventing them from enforcing their attorney's lien? They have admitted in the trial court that the order that they now say was not an order of attachment is, in fact, an order of attachment. And in that motion to lift the attachment, they complained about the surety or the security. In response to that, Judge Knight said file a letter of credit by a day server to perfect your attachment. And Dugan and Draper did so. Now, what is the effect of this attachment order? It is designed to secure the ultimate security asset pending adjudication of the claim that the petitioner hopes to have matured into a judgment. And that's exactly what happened in this case. After the attachment order was entered, Draper proceeded with his lawsuit in Jefferson County, Missouri, obtained a judgment for $2.5 million. The priority or lien of that judgment relates back to the date of the attachment order. We've cited the cases in our brief. Since the date of the attachment order preceded the alleged attorney's lien, it takes priority. So even if we ignore the turnover order in this case that moots the appeal, if the court were to look at the merits, we would also see that Draper wins because his attachment lien enjoys priority over a later perfected attorney's lien. Now, I'm not going to discuss in detail the equitable lien theory. Suffice it to say that we have discussed it in our brief, but the court's order with respect to the equitable lien is not properly before the appellate court. The notice of appeal in this case appeals Judge Knight's order declaring that the statutory attorney's lien was subordinate to Draper's attachment lien. After that order was entered, Mr. Pavaza then filed another petition to enforce an equitable lien. Now, that was ultimately denied, but the point is is that the notice of appeal in this case appeals only from the order relating to the statutory attorney's lien. So this court doesn't even have jurisdiction to consider his argument regarding the equitable lien, but if the court were hypothetically to do so, we would see two things. One, there is no equitable attorney's lien because to have an equitable attorney's lien, you have to not have a statutory lien. It's equitable presupposes that you didn't avail yourself of your rights under the statutory lien procedure. Well, that's not the case here. The fact that they pursued a statutory lien deprives them of the ability to then resort to chancery to impose an equitable lien. Second, even if we allow this equitable theory to proceed, as a condition to have an equitable attorney's lien, there has to be an assignment of the client's cause of action to the lawyers. If we cited the case law on this in our brief, you look at the fee agreement between Cashner and Mr. Pavaza, there is no assignment. So they wouldn't qualify for an equitable lien even if it were in play. But more important, let's assume they have an equitable lien just for the sake of argument. Then we still resort to the question of priorities. And liens and equity, priority is not determined by timing. It's determined by the weight of the equities between the competing claims. And in this case, if we are to look at the equities of the situation, Draper must avail. The attorney's lien is based on the services that Mr. Pavaza and Mr. Duda were to perform in defending Draper, including the services they were to perform in defending Draper's claim against Cashner, a claim alleging that Cashner defrauded Draper. Now, they're saying Draper ought to be paying the fees that they generated to defeat his meritorious claim, a meritorious claim which resulted in a judgment for $2.5 million with an express finding that Mr. Cashner's committed fraud, that his conduct was outrageous, inequitable. If we are to measure the equities in this case, Draper is way ahead of the game in terms of the lawyers for Mr. Cashner. Their claim is derivative of their client. Their client has been proven to be someone who is not worthy of protection, proven in spades by a detailed judgment of the trial court in Jefferson County, Missouri, affirmed by the Missouri Court of Appeals. So, for all these reasons, Your Honor, we ask that the court either, A, dismiss this appeal for mootness, or, B, should the court receive, review the case on the merits to affirm. Thank you. Thank you, counsel. Reply? Yes, Your Honor. Let me address the issue of mootness first. He cited a couple of orders, one that I brought, December 19, 2014, and it's at his appendix page 147 with respect to his motion to dismiss the appeal. And if the court would turn to there now or at its leisure, you will find it runs through page 149. You will find nothing in that order which affords us the ability to appeal that order if we do not have a legal right to an appeal. And we did not have a legal right to appeal because of the remaining pending issues. And it was not of the nature of an order that was subject to a right to appeal. Yes, yes, I did file, seeking the court's patience with me, to reconsider its term of order, and then another order on February 18, 2015, also in their appendix at page 170. It's a one-page order. And you will find nothing in that order saying that we have a right to an immediate appeal. Your Honor, we're here arguing for our right to the attorney's fees for the first time on its merits today. Now, he says, well, you're late. Too much has happened. Even if you have a right, it's moot. Well, that's equitable, isn't it? We don't have a right to protect our rights here until after he says it's too late. He says that our fee agreement was, contingency fee agreement, was to defend Mr. Cashner against Graper's Plains and Jefferson County. We don't write fee agreements where there isn't a judgment at the end that we'd be entitled to recover. We recovered, we recovered, over $144,000 from Mr. Cashner. That constitutes the contingency fee. The actual motion for the takeover put the judgment then, at that time, at over $166,000, actually. The court heard from Mr. Anthony, and he said many, many things. But one of the things he said that I thought might register with you all is he said that in July 13, Judge Knight told them in response to our motion that he wants to make hay with, that he got until September, I'm going to set aside that motion giving you a right to attachment to perfect, that was his words, to perfect your order of attachment. Well, to perfect. How do you perfect something that's already perfected? How do you do that? If he wants to claim that we've somehow admitted there's an attachment bond because my partner filed a motion to state saying, hey, you don't even have sufficient security, then I guess he just has taken the position that they didn't have an order of attachment until September the 4th, 2013. And I guess that's what he meant. Because he said it. He said you got until then to perfect your attachment order. Remember the series of facts I gave you? Our trial in our statutory land, he calls it purported statutory land. There's nothing purported about it. It's in the record. There was no perfection of the attachment order at that time. We had a right that the judge dismissed, ignored. He says that so-called attorney's fees, really? I didn't see Mr. Antonoli representing Mr. Cashman to acquire an $144,000 judgment. We did. Draper got the benefit of that. Then he wants to claim that our equitable claim is somehow not before the court. I disagree with him. It is. He also states without sight to any authority that somehow we have to choose between an equitable lien or a statutory lien. Well, if nothing else, our equitable lien did attach at the time of the signing of the agreement. Your Honor, this is not moved. You have the case before you. We ask that the court do right. Thank you, Your Honor. Thank you, Counsel. We'll take the matter under advisement, issue a decision in due course. Thank you. We'll take the final case of the morning.